IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CARL EMERSON-BEY,     *
     Petitioner,
  v.       * CIVIL ACTION NO. JFM-12-0314

ATTORNEY GENERAL OF THE STATE *
OF MARYLAND, *et al.*,
     Respondents.  *
         ***

### MEMORANDUM

Petitioner Carl Emerson-Bey, by counsel, has petitioned pursuant to 28 U.S.C. § 2254 for habeas corpus relief and challenges his 2006 conviction after a jury trial in the Circuit Court for Baltimore City for the first-degree murder of his wife and related handgun offenses.

The parties' submissions have been reviewed. For the reasons that follow, petitioner Carl Emerson-Bey's petition for writ of habeas corpus (ECF 1) along with his amendment and memorandum of law in support of petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF 40 & 42) IS GRANTED. Accordingly, petitioner's conviction and sentence are VACATED, and the case is remanded to the Circuit Court for Baltimore City for a new trial.

### Factual and Procedural History

Carl Emerson-Bey was convicted of first-degree murder, use of a handgun in the commission of a crime of violence, and illegal possession of a handgun in the Circuit Court for Baltimore City after a jury trial presided over by the Honorable M. Brook Murdock. ECF **7**-1.

The crime concerned the murder of Emerson-Bey's estranged wife, Jennie Emerson-Bey in her home on June 30, 2004. No direct or physical evidence linked Emerson-Bey to the crime. The State's theory of the case was that Emerson-Bey had killed his estranged wife due to

1

financial difficulties and their estrangement. The evidence adduced at trial surrounded Emerson-Bey's motive: the parties were estranged, Emerson-Bey had been cheating on his wife, and he was in financial trouble; and his opportunity: there was no sign of a forced entry to the crime scene (the victim's home) and Emerson-Bey had, at one time possessed the code to the alarm and keys to the property. A single palm print of Emerson-Bey's was found in the home. Emerson-Bey previously lived in the home.  However, the victim's daughter testified that she had scrubbed the house a few weeks before the murder as the victim was opening a home day care and the home was to be inspected.  There was conflicting testimony as to whether/when Emerson-Bey had been back in the home after the house had been scrubbed.

Subsequent to the murder, Phyllis Mason, also known as Leteara Thompson, was arrested on unrelated charges.  During her interview with police she advised that she was getting high in the alley with a friend (Tiffany Jenkins) on the night of the murder. She said she heard gun shots and saw a man flee the home. She identified Emerson-Bey in a photo-array.  Jenkins was later interviewed by police. She agreed she was in the alley on the day of the murder (although she indicated she was there during the day-not at midnight when the murder occurred), heard shots, and saw a man flee the home, but she was unable to identify Emerson-Bey.

Prior to trial Phyllis Mason died. During trial Tiffany Jenkins could not be located. There is no dispute that the identification of Emerson-Bey by Mason was inadmissible due to her death and the prosecutor agreed not to introduce same. Nonetheless, during defense counsel's (Fowley) cross-examination of lead detective Carew, he elicited testimony of the identification of his client as having fled the scene of the murder. In an apparent effort to cure his error, Fowley compounded the error by leading Carew through an examination that was so confused that the

names and roles of the two women became muddled and it appeared to the jury that Emerson-Bey had been identified by both women. Although the detective's testimony was highly inaccurate, defense counsel took no action to cure this error by way of objecting, moving to strike, or seeking a mistrial or a new trial.[1]

The facts as summarized by the post-conviction court follow:

On August 30, 2004, Jennie Emerson-Bey was fatally shot in her home in Baltimore City as she was returning home from work[3], Tammy Malone, the victim's daughter, testified (T. 11/10/05 pp. 48 et seq.) that on August 30 at about 2:00 p.m., she went to the victim's home for the purpose of driving her to work. When they left the house, the doors were closed and locked, and the alarm was set. After the victim's shift ended, Ms. Malone and her minor son, Emmanuel, drove the victim from work back to her home. Usually when she dropped her mother off, her mother would open the door and then signal Ms. Malone to leave. On the night of the shooting, however, Ms. Malone dropped her mother off, and her mother opened the door and "threw her hands up as if to say wait a minute....[s]he didn't hear the alarm."[4] Ms. Malone then observed the victim "walking around the chair, she went to the staircase and then she was in the living room," and "[s]he looked up and when she looked up, [Ms. Malone] noticed her backing up, blocking her face, and the gunshots started ring off and [Ms. Malone] see the bullet flashed on her arm."[5] Ms. Malone called 911 from her cell phone and went into the house where she noticed that "the back door was wide open and the back fence was open, the basement door was open. . . ." Ms. Malone testified that "a little of the [Petitioner's] belongings" were kept in the basement. Ms. Malone did not notice any ransacking in the home and that she was not able to see who the shooter was.[6] (T. 56-59).

Ms. Malone testified that her mother had married Petitioner on March 16, 2002 and was diagnosed with breast cancer two months later. Petitioner thereafter paid little attention to the victim. In March, 2004, Petitioner had told her that he had no money and was working a night job. In July 2004, when her mother found out that Petitioner had been cheating on her, she asked Petitioner to move out of the home and she changed the door lock. To Ms. Malone's knowledge, the other locks were not changed, nor was the code to the alarm system changed; only Petitioner and the victim had the code to the alarm system.

---

[1] At the first offer of the inadmissible evidence by the detective, counsel requested to approach the bench. The trial judge denied the request.

Objections by Petitioner's trial counsel were sustained so as to limit or avoid testimony about Petitioner's removal of property from the victim's home, borrowing money from the victim, and his conduct at the victim's funeral. However, when Petitioner elected to testify himself, he variously described having taken certain property from the house after the couple's breakup, taking the computer from the house after the victim's funeral, and having worked as an agent for the alarm company. (T. 11/15/05 pp. 80, 98, 103 *et seq*.). The parties stipulated that Petitioner had worked for Security Watch (the alarm company) in March and April 2004. (T. 11/14/05 pp. 7-8).

Ms. Malone testified that on the date of the shooting, the victim and Petitioner were still separated, and were not reconciling their relationship, although they periodically talked on the phone and Petitioner occasionally drove the victim to work or to do errands. In August, 2004, Petitioner owned a Ford Focus, but it was repossessed in late August (T. 11.10.05 p. 99). At the beginning of September, however, just prior to the victim's funeral, Petitioner was driving a Jeep Limited. Ms. Malone and Petitioner were beneficiaries of the victim's life insurance policy.[7]

Veronica Malone, another daughter of the victim, testified (T. 11/10/05 pp. 160 *et seq*.), that after he mother and Petitioner separated in June, 2004, their relationship consisted of "[a] lot of bickering on the phone and maybe some rides to places. . . ." Ms. Malone stated that although the victim and Petitioner did talk on the phone after they separated, "it was a lot of pointing finger, accusations." (T. 11/10/05 pp. 170 et seq. on cross examination by defense counsel). A couple of the victim's conversations with Petitioner were "in reference to borrowing some money that was owed. . . [s]omebody calling her house and saying things on the phone or cussing her out. Doing that stuff." She stated that around July 1, she changed the lock to the front door of the house, and only her mother had a key to the new lock.[8]

Ms. Malone described her mother's preparations to open a home licensed daycare. Shortly before the murder, Ms. Malone had cleaned the victim's house to prepare it for inspection. She "went through the house, redid all her woodwork, all her banisters, all her doorknobs [and] light fixtures." She scrubbed and used cleansers on all of the surfaces in the home. Petitioner had come to the victim's home prior to the cleaning to "fix something." Ms. Malone did not know if Petitioner had returned to the house after the cleaning.[9] Petitioner later testified that he had been all over the house, routinely. (T. 11/15/05 pp. 75 *et seq*.).

Detective Gordon Carew, the primary detective, testified (T. 11/14/05 pp. 11 *et seq*) that he did an inspection of the house "looking for all the doors and windows to see how somebody could have gotten into the location." He stated that what he found was "a little unusual, because [he] didn't see an obvious point of entry. All

4

the doors and windows appeared intact. They weren't disturbed. . . everything was secured"; thus, he "had to assume that whoever gained access to the house did so with a key." Detective Carew had checked all of the windows in the house and there were no pry marks or other signs of forced entry. A five-foot A-frame ladder outside the house would not have reached the second floor window.

Detective Carew testified that on September 2, 2004, Petitioner contacted him at the homicide unit and requested access to the property to retrieve a fax machine, a computer, a television, and some other miscellaneous items. Petitioner wanted access to the victim's bank accounts.[10] On cross examination, Petitioner's attorney asked Detective Carew why appellant would have called his office for access to the house if he had keys to the house, to which Detective Carew responded, "[h]e would call me to try to establish that he didn't have keys, if he was trying to cover up a crime." Detective Carew believed that Petitioner had keys to the house.[11]

On September 8, 2004, Detective Carew executed a search warrant on Petitioner's father's house, where Petitioner was then living. During the search, Detective Carew found a "Provident Bank envelope with cash in it, and . . . a paper, newspaper clipping about the murder of the [Petitioner's] wife. The [Petitioner's] ID card, a Provident Bank information card, a security alarm card with instructions on it. Some phone numbers, some. . .banking and account documents. . . ." Also found was "almost 2 hundred 50 dollars" and "a variety of paperwork and records relative to bank account, and. . . financial records that show monies."[12]

Detective Carew testified on cross-examination by Mr. Fowley that only Petitioner and the victim knew the code of the burglary alarm and that Petitioner had a house key, when pressed, Detective Carew conceded that Tammy Malone also had the alarm code "at one point" (T. 11/14/05 pp. 60-61) and that Detective Carew "didn't personally see the keys. But I believe he had access to the house using keys." (T. 11/14/05 p. 58).

Mr. Fowley pressed Detective Carew as to the adequacy of the Detective's investigation and his findings. That line of inquiry continued in pertinent part.[13]

> Q: Now, Det. Carew, was there, you did exhaustive canvassing of the neighborhood for witnesses that might have seen something correct?
>
> A. **Yes, sir.**
>
> Q: Talked to various people on both Milton and Biddle?
>
> A. **That's the cross street here, Milton and Biddle, yes.**

Q: Yes. And through all the people you talked to, did any of them indicate that my client, Mr. Carl Emerson–Bey was at or near the location within 24 hours of this incident?

A. **Yes, sir**.

Q. Who is that?

A. **That would be Veronica Jenkins, James, Tiffany Jenkins. She had several different names.**

Q: Is that witness—

     MR. FOWLEY: Your honor may we approach?

     THE COURT:    No. Ask your next question.

     BY MR. FOWLEY:

Q. Is she going to be a witness in this case?

A. **No, sir.**

Q. She's not going to give any evidence in this case?

A. **No, sir because, she after she gave a statement, identification, she overdosed prior to trial.**

Q. Yes, and she was not able to pick, my client out on further ID lineup, was she?

A. **She did identify your client at a photo lineup in the past as the person coming out of the house right after the shooting.**

Q. Okay.   And she had been arrested—how did she come to your attention?

A:   **She was arrested on another charge, and when she was interviewed, she said she had information about the shooting on Biddle Street, so she was transported to Homicide and interviewed. I taped her interview, and she said she could identify the person that came out the back.   She said she was standing in the yard right behind the victim's house, and after the shooting, she said the**

6

**Defendant, and she identified him in the photo array, he came out of the back door.  She identified him in the photo array, and she gave a taped statement of what she saw.**

Q.  She was high at the time?

A.  **She said all the statement was true.  She was very sure of what she saw, and she gave a very detailed statement**.

Q.    She knew him from the neighborhood, she worked that neighborhood?

A.  **Yes, she frequented that location of Biddle Street, Milton Avenue virtually every day, actually using drugs in the alley behind the victim's house, so she heard gun shots and saw him come running out.  She identified him in the photo array.**

Q.  Now, is there any evidence you gathered at the crime scene in terms of hair evidence that links my client to that crime?

A.  **No, I'm sorry, there would be—no.**

Q:  Is there any hair evidence?

A:  **No.**

Q:  Any blood evidence?

A:  **There was the victim's blood**.

Q:  And whoever shot the victim would have had to walk past the victim. She was at the bottom of the stairs and the shooter was at the top of the stairs; is that right?

A;  **Yes.**

Q:  Okay. And you had a chance to get the shoes and clothes from my client up at Aiken Street, right?

A:  **Yes, sir, but I stepped over that location, and I was there quite a bit, and I didn't step in any of the blood, so it's reasonable to assume that anybody else, even at the crime scene didn't get blood on them.**

7

Q:  Well, did you submit any shoes or clothes to the crime lab to be checked if any blood was on it?

A:  **No, because it is a very unlikely thing.**

\*       \*       \*

(T. 11/14/05) pp. 64-66)

Within minutes of these exchanges on cross examination, and after further inquiry as to the absence of tests of Petitioner for blood or gun shot residue, and after attention to an unlocked window on the second floor of the victim's house, the Court recessed for lunch.

During the lunch break, Mr. Fowley would have had access to the September 16, 2004 recorded and transcribed statement of Leteara Thompson (aka Phyllis Mason), as follows:

Carew:     . . .I'm going to take you back to the events that occurred on Biddle Street, uhm, I'm sure you remember that night, uh, can you tell me what happened?

Thompson:     Yes, me and the uhm, a girlfriend of mine was standing, well, first we were standing right on uhm, on Biddle Street, right on the corner, and uhm, I seen when, uhm the daughter and son, son-in-law had dropped, you know, the lady off and after that, we had went straight to the alley. We were standing there talking, and next thing we, well, the next thing I know, heard about 6 or 7 gunshots went off, and then that's when the guy came running out of the third house where the lady live, at, and he had like a, a gold and black long gun in his hand, and then he ran to the left of the alley toward Montford.

Carew:     Okay, can you describe his clothing?

Thompson:  Okay, he had on a black and orange like kooky hat, black jeans, and an orange shirt.

Carew:  Alright, did, uh, have you seen him before?

Thompson:  Well, I've seen him around the neighborhood sometimes, yes.

Carew:  And is he uh, related to the victim?

Thompson:  Well, as far as I know, I think he's like a boyfriend or something like that to her.

Carew:  Okay, alright, so so, you've seen him at the house before?

Thompson:  Yeah, around.

Upon returning from the lunch break, Mr. Fowley pursued no motion to strike, but revisited Detective Carew's testimony:

THE COURT:  Okay, Detective, I remind you, you are still under oath. You will recall when we took a recess, we were in the middle of cross-examination, Mr. Fowley.

Mr. Fowley:  Thank you, Your Honor.

BY MR. FOWLEY:

Q:  Now, we were discussing Phyllis Mason, you said she had aliases?

A:  Yes, sir.

Q:  What were the aliases, one or more than one?

THE COURT:  I'm sorry. I can't hear you, Mr. Fowley. The question was what were those aliases?

MR. FOWLEY:  Yes, Your Honor.  Thank you.

THE COURT:  You are certainly welcome to refer to your notes.

THE WITNESS:  Thank you, Judge.  I was going to pull the information sheet.

THE COURT:  That is fine.

THE WITNESS:  All right.  One Phyllis Mason is one name.  And she also used Lateara Thompson: that was another name.

BY MR. FOWLEY:

Q:  Why does an individual use aliases?

MS. BANKS:  Objection, Your Honor.

9

THE COURT:  Sustained.

MR. FOWLEY:  Okay.

BY MR. FOWLEY:

Q:  You had mentioned that Phyllis Mason Lateara Thompson was high at the time she allegedly made this observation; is that correct?

A:  **Yes, sir.**

Q:  And was she high on drugs or alcohol or both?

A:  **I believe she was---**

MS. BANKS:  Objection, Your Honor.

THE COURT:  Overruled.

A**:  I believe she had both.**

BY MR. FOWLEY:

Q:  Okay.  And do you know the quantity of drugs and alcohol that she was high on at the time of these alleged observations?

A:  **No, sir**.

Q:  Okay.  Now, this witness did not come voluntarily forward contemporaneously with this incident, she did not come forward at the time of the incident?

A:  **No, sir, she did not**.

Q:  In fact, these alleged observations were only found out about after she was arrested for a crime, is that a fair statement?

A:  **Yes, sir**.

Q:  Okay.  And when she was arrested, that was at least three months or so after this incident, isn't that correct?

A:  **Yes, sir.**

10

Q:  Was it in October or November?

A:  **Let's see, my interview date with her was actually the date after the Defendant's arrest on the 16th of September**.

Q:  Okay, About a couple of weeks later.  Okay.  And the charges against her were ultimately dropped; is that correct?

MS. BANKS:  Objection, Your Honor.

THE COURT:  Sustained—no.  Well, no, I'll overrule that objection. Were they dropped?

THE WITNESS:  I don't know the disposition of the charges.

THE COUIRT:  So the answer is you don't know?

THE WITNESS:  I don't know.

BY MR. FOWLEY:

Q:  This area at Biddle Street which is the subject of this crime, that is a heavy crime area, is it not?

MS. BANKS:  Objection, Your Honor.

THE COURT:  Overruled.

A:  **Yes, sir.  There is a lot of crime in that area**.

(T. 11/14/05 pp. 71-74).

*        *        *

Petitioner called several witnesses to testify.[14]  Petitioner's sister, Joan Person, testified that Petitioner was the executor of the victim's estate, and attended to the funeral costs.  Ms. Person also described Petitioner's relationship with his wife:

Q:  Do you have personal knowledge of Mr. Emerson-Bey's relationship with his wife during the period of separation?

A: **Yes, they were still cordial with each other.  He still took her to work at times. They still called often**.

11

Q:  Okay, So you say he took her to work, so he would go to her home?

A:  Yes, and pick her up and take her other places that she needed to go also.

Q:  Okay, Like where, specifically, if you know?

A:  I remember them going to get eyeglasses together.

Mr. FOWLEY:  Uh-huh, uh-huh.  Your Honor, May I approach the witness?

THE COURT:  yes.

BY MR. FOWLEY:

Q:  Let me show you what's been marked Defendant's Exhibit No. 2 and ask you is that, do you recognize those papers?

A:  **Yes**.

Q:  And what are they?

A:  Verification they went to see about eye glasses from Four Eyes.

MR. FOWLEY:    Your Honor, we would offer into evidence, Defendant's 2?

MS. BANKS:  No objection, Your Honor.

THE COURT:  So admitted.  Defendant's 2.[15]

BY MR. FOWLEY:

Q:  Now, do you have any personal knowledge of when Mr. Emerson-Bey, your brother, may have changed the locks on the Biddle Street home?

A:  It was in, I believe it was a few days after the funeral, he changed the locks.

Q:  Okay.

A:  **Okay.  And he called Pop-a-lock to come and change the locks**.

Q:  Okay. Prior to that, did he have a key to the residence, if you know?

A:  **Not to the present locks that were on there at that time**.

Q:  Not until he had them changed?

A:  **Right**.

Q:  Was Mr. Emerson-Bey set up through the court as executor of the estate?

A:  **Yes.**

MS. BANKS:  Objection, Your Honor.

THE COURT:  Overruled.

BY MR. FOWLEY:

Q:  Okay. So it was his duty to take care of any funds and straighten out any bank accounts?

A: **Yes.**

Q:  And also secured the property by changing locks?

THE COURT:  I'm sorry. Was that a question?

MR. FOWLEY:  Indeed it was, Your Honor.

THE COURT:  Will you rephrase it, please.

BY MR. FOWLEY:

Q:  Yes.  Pursuant to the duty of personal representative of the estate, was it also his duty to change the locks on the premise to make sure the property was secured?

A:  **Yes.**

THE COURT:  Well, Ms. Person, there was no specific duty to change the locks, were there, to your knowledge?  Was he specifically required to change the locks?

THE WITNESS:  Yes, to enter his own residence, yes.

THE COURT:  So you are saying he changed the lock so he could get in?

THE WITNESS:  Yes, it was his residence at the time.

BY MR. FOWLEY:

Q:  Okay.  Prior to this shooting, was your brother employed, do you know?

A:  **Yes.**

Q:  And where was he employed?

A:  **At Checkers, and he also was getting another job at Walgreens**.

Q:  Okay.  Let me, if I might, approach the witness. Let me show you what's been marked Defendant's Exhibit No. 3 and ask you what that document is?

A:  It verifies that he was an employee of Checkers.

(T. 11/14/05 pp. 158-161).  Ms. Person also testified that she knew that Walgreen's had called Petitioner for a job (T. p. 163).

Natasha Covington, who had been dating Petitioner, testified (T. 11/15/05 pp. 6 *et seq*.) that she called him on his cell phone on August 30, 2004, at 10:52 p.m. and he was sleeping. She could tell he was sleeping because of the way that he sounded when he answered the phone, and that Petitioner told her he was sleeping. Even though Ms. Covington called Petitioner on his cell phone, she could tell that he was at his father's house because he had the television on in the background. She did not see Petitioner at his father's house.  Ms. Covington saw Petitioner the next morning and he was "normal."

Carlton Henry, Petitioner's nephew, testified (T. 11/15/05 pp. 46 *et seq*.) that on the night of August 30, he went to bed at approximately 11:30 to 11:45.  He had to pass through Petitioner's bedroom to get to his bedroom.  As he did so, he

noticed Petitioner in bed.  Petitioner then told Mr. Henry that he "was going out."  Mr. Henry did not know when Petitioner returned home.[16]

Petitioner testified on his own behalf. (T. 1/15/05 pp. 63 *et seq.*).  He testified that on the night of the murder he was at his father's house.  He had three job interviews that day including one at Walgreen's.[17]  (T. 11/15/05 pp. 68 *et seq.*).  In order to work at Walgreen's Petitioner had to pass a urinalysis, which he took at 8:00 a.m. on the morning of August 31.  (T. 69-70).  Petitioner testified that after he and the victim had separated, he continued to see her five or six times per week, and sometimes two or three times a day.  Petitioner stated that aside from taking her to work and picking her up, he was also "in the house all the time," to "fix stuff."  He stated that the victim was opening a day care business in her home and "she asked [him] to move things out of [his] room that is upstairs in the middle room. . . ."  Petitioner testified that after the separation he "was in every room [of the victim's house] all the time," and he had taken property from the victim's house.  (T. pp. 72, 74 *et seq*).

Petitioner testified that he was appointed personal representative, took the computer from the house, and changed the locks, two days after the victim's funeral.  It was his duty to shut down the bank accounts on September 9-10, 2004.  (T. pp. 80-84).

_____

[3]Portions of the summary of trial evidence are drawn or adapted from the appellate opinion.

[4]Emmanuel Malone, the victims' grandson, a minor, testified (T. 11/10/05 pp. 145 *et seq.*) that on the night of the shooting, he and his mother drove the victim home.  When they arrived, the victim opened the door to her house and checked the alarm.  Emmanuel stated that the victim must have noticed that something "was not right," as she signaled to his mother not to drive away.  Emmanuel saw the victim walk through the living room and the dining room and into the kitchen where she flipped the lights on and off.  The victim then walked back through the house and reached the stairs.  At that point, he saw a flash and saw the victim throw her hands over her face.  Emmanuel heard six shots, and after the shots were finished, he saw "out of the corner of [his] eye. . .a little glare of a body going out the [back] door."

[5]Dr. Tasha Greenberg, assistant medical examiner, testified (T. 11/14/05 pp. 128 *et seq.*) that the victim was shot six times, with one gunshot wound to the head.  Using photographs throughout her testimony, Dr. Greenburg explained that the gunshot wound to the head entered on the right side of the head above the ear and traveled from right to left, entering the brain.  She explained the stippling and soot on the skin of a decedent indicates the distance of the gun to the wound, and in this case, the stippling and soot indicates that the gun was probably held two or three feet away from the victim's head.  Dr. Greenberg described how the bullets traveled through the victim's forearms. One of the wounds to the forearm had gunpowder stippling around it, indicating that the gun was fired from a close range.  Dr. Greenberg determined that the victim died of multiple gunshot wounds, and the manner of death was homicide.

[6]Responding Officer Anthony Smith testified that once the scene was secured, he was able to go through the house, and at that time he observed that the back door to the house was open.  He did not notice any signs of ransacking. (T.11.10.05 pp. 154 *et seq*.).

[7]On September 2, Ms. Malone went to her mother's house to look for important papers. At that time, she noticed that the "drawer that held the important papers in the basement, like her fax machine and computer, was gone." Petitioner later testified that he had taken the equipment.

[8]Petitioner later testified that he changed the lock two days after the victim's funeral. (T. 11/15/05 at p. 80).

[9]Michael Vallar, a police officer assigned to the crime lab as a technician, testified that a single latent print found on the second floor middle bedroom doorframe, was identified as appellant's.

[10]Peititioner testified that he closed the victim's bank accounts on September 9-10, 2005, urging that it was his "duty" to do so.  (T. 11.15/05 at p. 84).

[11]On September 7, 2004, Detective Carew found a window, broken from the inside out, on the first floor of the house.  The window was not broken during his initial visit to the crime scene (T. 11/14/05 p. 32).

[12]Detective Carew so testified without objection by Mr. Fowley. (T. 11/14/05 pp. 41 *et seq*).

[13]Petitioner challenges Mr. Fowley's cross examination of Detective Carew, for having elicited damaging testimony, for not succeeding to strike that testimony, for not securing Petitioner's Right of Confrontation as to an out-of-court declarant erroneously identified by Detective Carew.

[14]Petitioner called his civil attorney, a personal injury lawyer to testify.  Michael Milne testified that Petitioner had been in a personal injury auto accident on December 31, 2002 and opined that Petitioner "would have some [damages] recovery on, based on the facts of the accident and how the accident happened."  (T. 11/15/05 pp. 39-41).

[15]Defendant's Exhibit 2 described two orders for eyeglasses on August 3, 2004, one for Petitioner and one for the victim, with insurance claims forms to reimburse the victim (the insured) for both pairs of eyeglasses.

[16]Petitioner testified that he was in bed at 11:00 p.m. on August 30, but after his nephew arrived home, he got up and "left out to go to the store" to get a soda and chips.  He returned to his father's house about a half an hour after and went back to sleep.

[17]The parties stipulated (T.11/14/05 p. 9) that Defendant had worked for the security alarm company in March-April 2004.

ECF 7-6, pp. 6-20 (emphasis in original).

Petitioner was sentenced on January 19, 2006, to life imprisonment for the first-degree murder conviction and a consecutive 20 year term of incarceration for use of a handgun in the commission of a crime of violence. ECF 7-1.

He noted a timely appeal raising the following claims in the Court of Special Appeals:

1.  Did the trial court err in [admitting] irrelevant and prejudicial evidence?

2.  Did the trial court commit plain error by giving a prejudicial instruction on reasonable doubt that deviated from the pattern instruction?

Petitioner's convictions were affirmed on October 16, 2007.  ECF 7-2.  The court's mandate issued on November 15, 2007. *Id.*  Petitioner did not seek further review by the Court of Appeals of Maryland. ECF 7-1.

Petitioner instituted state post-conviction proceedings on April 17, 2008.  ECF 7-1; 7-3. By way of amended petition, petitioner claimed trial counsel was ineffective for failing to:

1. file mandatory motions;
2. verify petitioner's interview at Walgreen's on August 30, 2004;
3. obtain Sprint phone records of August 30, 2004;
4. obtain surveillance footage from a liquor store;
5. obtain a picture of his home with the door open in order to establish that witnesses could not observe the shooter;
6. move for an evidentiary hearing;
7. honor petitioner's request for a bench trial;
8. request discovery of witness interviews and Grand Jury minutes;
9. prepare Ms. Covington to testify;
10. interview Andrew Herman, a character witness;
11. inquire whether petitioner's father and nephew were intoxicated when they spoke to police;
12. visit petitioner or consult with petitioner regarding trial strategy;
13. honor petitioner's request to avoid a defense that postulated that someone climbed onto the roof of the house and entered through an open window;
14. move for a mistrial based on sleeping jurors;

17

15.    effectively cross-examine the detective through the use of physical evidence i.e. photographs and "crime Tech. Report" which contradicted the detective's testimony;

16.    insure that he was in court when proceedings began;

17.    file a motion for mistrial at the end of the State's case in chief and at the end of trial;

18.    request an alibi instruction;

19.    interview or subpoena Brian Watkins and Sean Thompson to impeach Detective Carew;

20.    request a mistrial based on biased jurors;

21.    explain a letter that was not admitted at trial;

22.    impeach or file perjury charges against Detective Carew;

23.    call Inell Pears and Wade Emerson to testify;

24.    file a motion for a new trial;

25.    raise claims of prosecutorial misconduct; and

26.    rebut the State's claims that petitioner was fired from his job and at odds with his wife.

ECF 7-3; 7-4.  Petitioner also asserted that the trial court erred by:

1. Not curing a defect in the trial caused by biased and sleeping jurors;
2. Not allowing him to participate in a conference with the victim's children;
3. Threatening petitioner with a gag order;
4. Acknowledging trial counsel's ineffectiveness in making objections;
5. Refusing counsel's request to approach the bench during Carew's testimony;
6. Failing to protect petitioner's right to confront his accuser;
7. Not placing the jury instruction conference on the record;
8. Ignoring petitioner's late arrival into court;
9. Giving an ambiguous unanimity instruction;
10. Adding language to the pattern reasonable doubt instruction;
11. Not requiring counsel to consult with petitioner regarding a letter excluded from evidence;
12. Not summonsing petitioner to court prior to the jury deliberations; and
13. Failing to address his letters of complaint.

Additionally, petitioner claimed that the prosecutor committed misconduct by:

1. Refusing to provide the defense taped statements of witnesses;
2. Lying during opening statements; and
3. Failing to correct Detective Carew's testimony.

ECF 7-4.  Petitioner also claimed that appellate counsel was ineffective for failing to raise issues

and request an oral argument.  ECF 7-3; 7-4.  The petition was supplemented by counsel who

alleged that trial counsel was ineffective for: (1) eliciting damaging information on cross-examination of Carew; (2) not filing for sentence review or modification; (3) failing to impeach Emmanual Malone with an inconsistent statement; and (4) the cumulative effect of these errors. ECF 7-5.

Hearings on petitioner's claims were held on May 21, 2009 and June 25, 2009. ECF 18-19; ECF 18-20. Petitioner was the only witness to testify at the post-conviction hearing as his trial attorney, James Fowley, had died prior to the hearings. ECF 7-6, p. 2.    In an opinion and order dated July 16, 2010, the post-conviction court denied relief. *Id*.

The post-conviction court agreed that counsel's performance in cross-examining the detective was deficient but found that it was reasonable for defense counsel, as a matter of trial tactics to endeavor to "impeach" or cure the hearsay testimony through further cross-examination rather than by moving to have it stricken or by moving for a mistrial or a new trial. The post-conviction court also found that Emerson-Bey could not sustain the prejudice prong of *Strickland* finding that the errors were not so serious that he was denied a fair trial and that the evidence against petitioner was "overwhelming."

The post-conviction court held that "considerable testimony about Petitioner's fallout with the victim, his declining financial circumstances and lost job, [and] marital and financial disputes with the victim" was presented by the State. ECF 7-6, pp. 38-39.  The post-conviction court further noted that "Petitioner was the beneficiary of his wife's insurance and bank accounts Petitioner had borrowed money from the victim and she had demanded its return."  *Id*.

In considering Petitioner's ineffective assistance of counsel claim, the court noted that "Petitioner has sufficiently identified Detective Carew's answer to Mr. Fowley's questions, and

counsel's failure to move to strike or move for mistrial (without correction by the prosecutor or judge), as treading on his rights under the Confrontation Clause, resulting from 'unreasonable professional judgment.' Trial counsel's representation likely fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 690. In that regard, Mr. Fowley's representation was deficient." *Id*, p. 36. The post-conviction court however, held that Emerson-Bey's *Crawford* 2claim in the context of judicial error could not be considered as the issue was not preserved by trial counsel. *Id*., p. 47.

Petitioner, through counsel, filed an application for leave to appeal the adverse findings of the post-conviction court.  ECF 7-7. The counselled application alleged that trial counsel was ineffective for eliciting inadmissible hearsay and failing to object to the witness's statements. *Id*., p. 2. On December 10, 2010, although still represented by counsel, petitioner filed a supplemental application for leave to appeal alleging that trial counsel was ineffective for:

1. Failing to file mandatory pretrial motions;
2. Failing to request a pretrial evidentiary hearing;
3. Failing to file discovery motions;
4. Failing to request alibi instructions;
5. Opening the door for prejudicial testimony;
6. Failing to strike damaging testimony;
7. Failing to impeach a witness; and
8. The cumulative effect of the errors.

Petitioner further alleged that appellate counsel was ineffective and that the trial court erred by: (1) denying him his right to face his accuser; (2) failing to give an alibi instruction; and (3) failing to dismiss the jury. Petitioner also claimed prosecutorial misconduct arising during closing argument and in not disclosing the identity of witnesses interviewed. Lastly, petitioner claimed that the post-conviction court did not address all of his claims. ECF 7-8.

---

[2] *Crawford v. Washington*, 541 U.S. 36 (2004)/

In an unreported opinion, the Court of Special Appeals summarily denied the application for leave to appeal on July 15, 2011. *Id.* The court also denied petitioner's motion for reconsideration.  The court's mandate issued on December 22, 2011. ECF 7-9.

Petitioner filed the instant petition pro se. ECF 1. Subsequently the court appointed counsel for petitioner. ECF 24.  Counsel filed an amended petition, withdrawing all claims save the following:

> 1.      Ineffective assistance of trial counsel: when cross-examining Det. Carew trial counsel elicited inadmissible hearsay and confrontation clause violative prejudicial testimony regarding the alleged statement and identification given by Phyllis Mason aka Leteara Thompson and Tiffany Jenkins.
>
> 2.      Confrontation Clause violation under *Crawford v. Washington* and the Sixth and Fourteenth Amendments when trial counsel elicited inadmissible hearsay and prejudicial testimony from Det. Carew regarding the alleged statements and alleged identification by Mason aka Thompson and Jenkins.

ECF 40.

Respondents do not contend, and the court does not find, that the petition was filed outside the one-year limitations period set forth in 28 U.S.C. § 2244(d)(1).  Further, petitioner no longer has any state direct review or collateral review remedies available to him with respect to the claims raised in this court; thus, his claims are exhausted for the purpose of federal habeas corpus review.

### Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings" *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  The standard

is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* __ U.S.__, __, 134 S.Ct 1697, 1702 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement."); *Virginia v. LeBlanc*, 582 U.S. __, 2017 WL 2507375 (June 12, 2017).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. 86, 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Rather, that application must

be objectively unreasonable." *Id*. Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S.290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. **"**[A] a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly.*" Renico v. Lett,* 599 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

## Analysis

Before addressing Emerson-Bey's *Strickland* and *Crawford* claims it is necessary to discuss more fully the evidence presented during his trial which the post-conviction court found to be "abundant" proof of his guilt. Review of that evidence informs the consideration as to

whether the claimed errors prejudiced petitioner and further informs the determination as to whether the claimed errors call into question the fundamental fairness of Emerson-Bey's trial.

1.    Factual Background for Petitioner's Conviction

The post-conviction court held that:

> The State's evidence against Petitioner Carl Emerson-Bey was abundant. Officer Anthony Smith, who arrived at the victim's home shortly after the shooting, testified that when he arrived at the scene, the back door was ajar, but he did not observe any signs of ransacking. Police investigation did not reveal any broken windows until discovered by Detective Carew on September 7, 2004. Officer Smith hand canvassed the areas to locate possible witnesses. One neighbor had heard a woman screaming and another heard gunshots ring. The State's sequence of witnesses included Mrs. Emerson-Bey's daughter, Tammy Malone, grandson Emmanuel Malone, and daughter Veronica Malone, and considerable testimony about Petitioner's falling out with the victim, and Petitioner's access to the victim and her home, and the victim's distrust of the Petitioner so as to prompt her to change the locks. Significant evidence unrelated to Detective Carew's testimony also included the Malones' graphic description of the victim's return home when she had unlocked the front door, and signaled for trouble as if the alarm had already been shut off. Petitioner was the beneficiary of his wife's insurance and bank accounts. Petitioner had borrowed money from the victim and she had demanded its return. Her neighbors were advised that Petitioner did not belong in the house. Petitioner's print was found on a wall at the top of the staircase, consistent with the killer's likely position when gunfire began on August 30, 2004.

ECF 7-6, pp. 38 -39

The findings of facts by the post-conviction court in regard to the evidence supporting Emerson-Bey's guilt are not supported by the record.

A.    Evidence of Motive:

The State alleged that Emerson-Bey lost his job at Checkers shortly before the murder (ECF 7-6, p. 27) to bolster its theory that Emerson-Bey was in dire financial straight. However, the evidence introduced at trial showed that Emerson-Bey resigned from Checkers on August 17, 2007, due to his having better prospects of working at Walgreens. Emerson-Bey was not fired.

24

Testimony demonstrated he believed he had employment at Walgreens, had passed the initial interview, and submitted to a urinalysis the day after the murder. Shortly before the shooting he was employed at Checkers Restaurant. ECF 18, Ex. 15, p. 53; *id.*, pp. 161-63. He was also, as noted above, in the process of being hired at Walgreen's Drug Store where he took a urinalysis for that employment at 8 a.m. the day after the shooting. ECF 18, Ex. 16, pp. 69-71. Ultimately he was not hired by Walgreens when he withdrew from the orientation program because it conflicted with his wife's funeral. ECF 18, Ex. 15, pp. 53-54, Ex. 16, pp. 113-114. At the time of the shooting Emerson-Bey believed he would be hired by Walgreens and believed he was employable.  ECF 18, Ex. 16, p. 53. Additional testimony was offered that he knew how to cut hair and was certified in the cement trade, thus employable. *Id.*, p. 53.

The State relied upon Emerson-Bey's being named as a beneficiary on the victim's life insurance policy, along with the victim's daughter Tammy Malone, to bolster its evidence of motivation for the crime.  ECF 18, Ex. 14, pp. 117-120. Malone testified that she applied the proceeds of the policy to her mother's funeral expenses. There was testimony, however, that Emerson-Bey also contributed to the funeral and there was a dispute regarding whether the State demonstrated that Emerson-Bey even knew he was a beneficiary of the policy prior to the victim's death. ECF 18, Ex. 16, pp. 161, 171.

The State's evidence, regarding the alleged acrimonious relationship between the victim and Emerson-Bey was also contradicted. Testimony was elicited from Malone, the victim's daughter, that 4 months before Emerson-Bey and the victim separated in July of 2004, he gave the victim a diamond ring. ECF 18, Ex. 14, p. 124-25. Despite Emerson-Bey and the victim's separation, Malone also testified that Emerson-Bey and the victim spoke regularly after their

separation and that Emerson-Bey took the victim to run errands and had regular contact with the victim after their separation. *Id*., pp. 125-129. Emerson-Bey's sister testified that the same month as the shooting Emerson-Bey and the victim went to be fitted for eyeglasses together. ECF 18, Ex. 15, p. 158. Testimony was also offered that Emerson-Bey was in the victim's home making repairs and removing property after the separation. *Id*., Ex. 16, pp. 104.

The post-conviction court also improperly relied on other indicia of Emerson-Bey's status in its finding that ample evidence supported a finding of guilt. Evidence of Emerson-Bey owing money to the victim and of his adultery were matters of evidence which were specifically excluded by the trial court. *See* ECF 18, Ex. 14, pp. 77-79 ("You're not suggesting that the, solely by these IOU's and being poor and being an adulterer, are not motive for murdering anybody, so I will not allow any of this evidence in and I will not talk about it anymore.") pp. 95-98. *See Vitek v. State*, 295 Md 35, 40 (1982)("[T]he fact that appellant was unemployed and recently had been released from jail was irrelevant to the main issue of guilt or innocence and could not be used to infer motive"). Nevertheless, the post-conviction court relied on this information in support of the finding that sufficient evidence of Emerson-Bey's guilt was established without consideration of the improper identification evidence.

B.    Evidence of Opportunity

The properly admitted evidence at trial demonstrated that Emerson-Bey had been living in the home where the victim was shot until early July of 2004 when his wife asked him to move out.  He moved into his father's home. ECF 18, Ex. 14, pp. 83-84; Ex. 16, p. 47.  Both Emerson-Bey and the victim's daughters testified that thereafter he was back in the Biddle Street property on several occasions.  *Id.*, Ex. 14, pp, 127,  168-69,  73, 75, 76, 79, 103, 104-105.

Malone testified that she had cleaned the house from top to bottom in anticipation of an inspection for her mother to secure a day care license, and that to her knowledge Emerson-Bey had not returned to the property after this cleaning. ECF 18, Ex 14, pp. 163-168.  Contradicting the thoroughness of the cleaning, however, was testimony from detectives indicating that they found undisturbed dust and dirt on the windowsills in the house.  ECF 18, Ex. 15, p. 37; ECF 43-14.

While Emerson-Bey's palm print was found on the second floor middle bedroom door frame (ECF 18, Ex. 15, p. 115) the value of this evidence was extremely limited. There was no testimony or record evidence as to where  on the door frame the print was found.  *Id.*, p. 99.  More importantly, the State argued in closing argument that due to "good ridge detail" the print was only a few hours old. ECF 18, Ex. 16, p. 137, p. 175.  The crime lab technician's testimony as to the age of the print was not, however, conclusive. The technician testified that the print came from a door frame and that the wood was not a good surface for recovering prints. ECF 18, Ex. 15, pp. 94-95, 97.  He further testified that "there is no way to tell the age of that print" but that more detailed prints tend to be newer and older prints less detailed.  He did not testify as to the age of the print nor did he specify how the quality of the recovered print compared with other prints.[3]

The testimony as to the age of the print was impermissible expert testimony elicited from a non-expert (by defense counsel) during cross examination.  *See* Md. Rule 5-702, *Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir. 1923).  The crime lab technician had no apparent forensics

---

[3] Emerson-Bey argues that the court can take judicial notice, and the trial court, jury and post-conviction court should have taken judicial notice that finger prints are extremely difficult to date.  ECF 42, p. 17 (list of cases detailing difficulty in dating prints).

training; rather, his job was to lift the prints from the crime scene and submit them to the latent print examiner. The technician was not recognized as an expert in forensics by the court and the testimony regarding the age of the print was elicited by defense counsel. ECF 18, Ex. 15, p. 99. The latent print examiner testified and was qualified as an expert but did not offer any testimony as to the age of the print. *Id.*, pp. 101-115.

The post-conviction court also found that Emerson-Bey had access to the crime scene, however, once again the actual facts adduced at trial were not conclusive. The State maintained that Emerson-Bey, who worked for the alarm company used by the victim for one month in the spring of 2004, and as a former resident of the property, knew the basics of the operation of the alarm system. ECF 18, Ex. 13, p. 115. The state's theory at trial was that the murder was not a burglary gone awry and as such, the alarm had not been tampered with. No evidence, however, was presented at trial that Emerson-Bey used his knowledge of the alarm system to access the house on the night of the murder. Nor was there any evidence adduced at the trial that the alarm system was "disarmed by the Defendant." Rather, the evidence was inconclusive as to whether the alarm had even been activated when the victim left the home on the night of the murder. ECF 18, Ex 14, pp. 133-34. Testimony was offered that the victim signaled that something was wrong when she entered her home on the night of the murder and her daughter and grandson opined that it meant something was amiss with the alarm. Even if the alarm did not beep when the victim returned to the home, it would not have beeped if it was not set before her departure or in the case where someone else disarmed it. Moreover, during the post-conviction hearing evidence was produced that the security system was not working properly on the date of the shooting. ECF 18, Ex. 20, p. 228. The victim's daughter, testified that only Emerson-Bey and the victim knew

the code to set the alarm. ECF 18, Ex 14, p. 86. However Detective Carew testified that Malone told him that at least at one time she also knew the code. ECF 18, Ex. 15, p. 60.

Additionally, testimony was offered that the locks on the property were changed in early July of 2004. The victim's daughter Veronica Malone testified that after the locks were changed only her mother had a key. ECF 18, Ex. 14, p. 162.  Another daughter, Tammy Malone testified that during Emerson-Bey's separation from her mother in July-August, 2004, she heard her mother tell a neighbor that if she saw someone enter the property, whether they had keys or not, to watch out for her home. ECF 18, p. 14, p. 106.  Although the testimony was hearsay, the trial court admitted the testimony as a "state of mind" exception to the hearsay rule, to show that the victim believed Emerson-Bey still had keys to the home. ECF 18, Ex 14, pp. 103-104. While the victim may have believed Emerson-Bey had keys to the home, no evidence was presented that established he in fact had keys to the home after the locks were changed in July/August. Additionally, no evidence was presented at trial that the back door was actually locked on the day of the murder.

During his testimony, lead detective Carew, offered a number of unconfirmed theories as to whether Emerson-Bey possessed a key to the house (*id*., Ex. 15, pp. 57-59) but in fact no evidence was produced which showed that Emerson-Bey had such a key. Despite this conflicting evidence, the post-conviction court credited and re-characterized the evidence as the neighbor being told that petitioner did not belong in the house. ECF 7-6, p. 30.

In a further effort to show that Emerson-Bey had opportunity to commit the murder, the state endeavored to show that after the shooting Emerson-Bey had keys and therefore he must have had keys before the shooting. Officer Preston testified that on either September 10 or 15,

2004, he saw Emerson-Bey enter the residence with a key. ECF 18, Ex 14, p. 172 (9/10/14); p. 174 (9/15/04). The State argued in closing that this demonstrated that Emerson-Bey had keys to the home when his wife was killed. ECF 18, Ex. 16, p. 172. However, other evidence offered through the State's witness, contradicted this theory, *e.g.* Officer Carew testified that Emerson-Bey had the locks on the property changed on September 10, 2004. ECF 18, Ex. 15, p. 57.

Additionally in regard to access to the property, the state erroneously argued during its closing that Officer Preston testified that Emerson-Bey knew the alarm code, however the record reflects that Preston testified that when he encountered Emerson-Bey at the property, he had no recollection of Emerson-Bey turning the alarm off or touching the key pad. ECF 18, Ex. 14, p. 180. To the contrary, Preston testified that he was called to the house because the alarm had tripped, that he tripped the alarm again when he arrived, but that it stopped on its own after about 30 seconds, which is when Emerson-Bey showed up at the house and claimed responsibility for the initial tripping of the alarm.

The State also attempted to show that Emerson-Bey falsified evidence of an unlawful entry by someone else on August 30, 2004, by damaging a window. The state post-conviction court noted that the investigating officers did not find any broken windows in the residence until one was discovered by Detective Carew on September 7, 2004. ECF 7-6, p. 39. Carew testified that he found a window on the first floor of the Biddle Street residence that appeared to be broken from the inside. ECF 18, Ex 15, p. 32.

Cross-examination of Carew by Emerson-Bey's counsel, as to this point, was not effective. Fowley failed to confront Carew with the technician's report and photographs that showed glass inside and outside the broken window. ECF 43-14; ECF 43-16. Defense counsel

also failed to object to Carew's testimony as an expert as to the issue of the broken glass when the detective offered his opinion as to the direction of impact on the glass. Carew testified that he inspected the property on August 31, 2004, and did not find any broken windows. ECF 18, Ex. 15, p. 32. No evidence was offered at trial as to how the window identified on September 7, 2004, had been broken or how the breakage showed that the damage came from inside the property rather than from outside. Carew testified that he believed the window was broken from the inside because the majority of the glass was on the outside. Photographs of the window and surrounding area, however, show significant amounts of broken glass on the inside and outside of the window. ECF 43-16.

Contrary to the post-conviction court's findings, the motive and opportunity evidence was simply not "abundant" proof of Emerson-Bey's guilt. Rather the evidence was contradicted, and permissible of inferences of either guilt or innocence. The nature of the motive and opportunity evidence highlights the impact of Fowley's ineffective assistance in eliciting the improper identification evidence discussed below.

C.    Impermissible Identification:

On September 16, 2004, two weeks after the shooting Carew interviewed a 34 year old woman who identified herself as Lateara Thompson. Thompson was shown a photographic array and identified Emerson-Bey as fleeing the crime scene with a gun on the night of the murder. ECF 18, Ex. 15, pp. 64-76; *see also* ECF43-1.

Thompson was arrested that day in the same block as the murder for prostitution. "She was provided a photo array and identified suspect Carl Emerson-Bey as the person she saw come out of the back door of the house at 2438 E. Biddle Street after the shooting." ECF 43-1. A few

minutes after she identified Emerson-Bey from the photo array, and after being confronted by the police, she revealed that her real name was Phyllis Mason. ECF 43- 3. Thompson/Mason stated that she did not use her real name because she was afraid there was a warrant for her. *Id.*, p. 2. Thompson/Mason provided an oral statement which was later transcribed.  She stated that she and her companion, Tiffany Jenkins, were getting high at the time of the murder, when she heard a shot and saw a person she claimed was Emerson-Bey flee the house with a handgun. ECF 43-9.

Emerson-Bey was indicted on October 7, 2004.  On January 12, 2005, defense counsel filed a motion for additional discovery. ECF 43-5. The state filed a supplemental disclosure on January 20, 2005, stating that the defense could arrange to listen to recorded statements and offered that Thompson/Mason had contact with Officers Carew, Norris, Forsythe, and Pool. The state also stated there was no written agreement with Thompson/Mason. ECF 43-6.

On February 7, 2005, the State's motion to postpone the trial was granted due to Thompson/Mason's failure to appear. ECF 7-1, pp. 2-3; ECF 43-13. On March 12, 2005, Thompson/Mason died of "end stage HIV" and other illnesses. ECF 43-8. Carew subsequently erroneously testified at trial that she died of a drug overdose. ECF 18, Ex. 15, p. 64. On April 18, 2005, unaware that Thompson/Mason had died, the trial court issued a material witness warrant for her. ECF 7-1, p. 2.

On April 26, 2005, the police recorded Tiffany Jenkins' statement. ECF 43-9. Jenkins statement indicated that she heard gun shots on the night of the murder and saw someone running from the crime scene while "it was still light outside." *Id.*, p. 3. She could not identify the person fleeing the scene. *Id.*

On May 5, 2005, trial counsel wrote to the State asking for the date of birth and aliases for Tiffany Jenkins. ECF 43-11.  Counsel also asked whether Jenkins "failed to pick Defendant out of a photo array." *Id.* The State responded on May 12, 2005, indicating that Jenkins had not been shown a photo array. The State further indicated that pursuant to the Maryland Rules defense counsel was provided Jenkins' name and address and that was all that was required. ECF 43-12.  On June 22, 2005, the State maintained that it was not required to provide copies of witness statements to defense counsel, however, it asserted that counsel had the opportunity to listen to recorded interviews on February 28 and April 18, 2005. ECF 43-7.[4]

Before trial commenced both the State and defense counsel became aware that Thompson/Mason had died.  ECF 18, Ex. 12.  The State agreed to suppress Mason's identification of Emerson-Bey ECF 7-6, p 28, n. 20. And in fact, the State did not elicit testimony from Carew regarding the Thompson/Mason identification. ECF 18, Ex. 13, pp. 110-116.

During the State's case in chief, the following colloquy between defense counsel and Detective Carew occurred:

> Q: Now, Det. Carew, was there, you did exhaustive canvassing of the neighborhood for witnesses that might have seen something correct?
> A. Yes, sir.
> Q: Talked to various people on both Milton and Biddle?
> A. That's the cross street here, Milton and Biddle, yes.
> Q: Yes. And through all the people you talked to, did any of them indicate that my client, Mr. Carl Emerson–Bey was at or near the location within 24 hours of this incident?
> A. Yes, sir.
> Q. Who is that?
> A. That would be Veronica Jenkins, James, Tiffany Jenkins.  She had several different names.

---

[4] Notably these dates are prior to the recording of Jenkins' interview.

Q: Is that witness—"Your honor may we approach?
The Court: No. Ask your next question.
Q. Is she going to be a witness in this case?
A. No, sir.
Q. She's not going to give any evidence in this case?
A. No, sir because, she after she gave a statement, identification, she overdosed prior to trial.
Q. Yes, and she was not able to pick, my client out on further ID lineup, was she?
A. She did identify your client at a photo lineup in the past as the person coming out of the house right after the shooting.[5]
Q. Okay.

ECF 18, Ex. 15, pp. 63-64.

Counsel should have known not to ask the question regarding identification because he knew Mason/Thompson was dead and that Jenkins could not identify Petitioner. The State, however, did not object to Carew's improper disclosure of the identification during cross-examination. ECF 18, Ex. 15, pp. 63-74; ECF 7-6, p. 46, n. 31.  Assistant State's Attorney Banks offered during the post-conviction proceedings that she had objected to the misnomer/misidentification of Jenkins/Mason Thompson, but that she had been overruled by Judge Murdock and that for some reason the exchange did not appear on the trial transcript. Thereafter, defense counsel questioned Carew regarding the proper names of the witnesses.

Defense counsel attempted to limit the damaging testimony.  The post-conviction court found that Fowley effectively reacted to the unanticipated admission of the identification

---

[5] This testimony was false as Tiffany Jenkins never identified Emerson-Bey.  The post-conviction court noted that "Detective Carew volunteered erroneous information, and confused Jenkins' identity and role....Detective Carew's erroneous attribution to Jenkins and hearsay identification of the Defendant by a deceased witness was exaggerated in another non-responsive answer."  ECF 7-6, p. 33-34. The State failed to take any action to correct this error.  The post-conviction court asked the Assistant State's Attorney during the hearing about the failure to act to cure this error;  "at what point in time do the ethics rules enter into the State's Attorney's consideration?" ECF 18, Ex. 20, p. 245.  The Assistant State's Attorney responded that she objected but the court denied the objection and that this fulfilled her ethical duties as a prosecutor. Neither the objection nor denial appear in the record. *Id*., pp. 245-51.  No explanation was offered regarding the State's reliance on the inadmissible testimony during their closing. *Id*., Ex. 16, pp. 138-39, 175.  Whether the Government solicited the perjured testimony or not, if it knew or should have known the testimony to be false but allows it to pass uncorrected, the accused's right to due process is violated.  *See United States v. Kelly*, 35 F. 3d 99, 933-935 (4th Cir. 1994).

testimony by establishing on further cross-examination of Detective Carew that the initial testimony regarding the source of the identification was inaccurate and that Thompson/Mason used aliases, was high on drugs and/or alcohol at the time she provided the identification, and provided the identification in exchange for leniency in her own criminal case. ECF 7-6, pp. 36-38.

At the time of trial, in November of 2005, defense counsel did not have transcripts of the Thompson/Mason statements. ECF 43-2; 43-3. When counsel cross-examined Carew he had never seen the transcripts. The record evidence suggests that at best, defense counsel had an opportunity to listen to Thompson/Mason's statement no more recently than April 18, 2005, seven months prior to trial. Unlike the plethora of evidence as to defense counsel's discovery of the Jenkins' statement (a witness unable to identify Emerson-Bey), the record is bare as to whether trial counsel actually listened to the tape recorded interview of Thompson/Mason.[6]

In closing, the State relied upon Carew's disclosure of the Thompson/Mason identification by arguing that it proved Emerson-Bey's guilt. ECF 18, Ex. 16, pp. 138-39. The State also argued in favor of Thompson/Mason's credibility in its rebuttal. *Id.*, p. 175. Additionally, highlighting the importance of the identification testimony the trial court relied on the Thompson/Mason identification as a basis to deny Emerson-Bey's motion for judgment of acquittal. ECF 18, Ex. 15, p. 150.

2.    Ineffective Assistance of Counsel

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the

---

[6] The State did not provide Fowley with transcripts of the interviews of Thompson/Mason prior to trial.

court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id.* at 696.

As the Supreme Court held in *Strickland v. Washington*, *supra*, "a state court conclusion that counsel rendered effective assistance of counsel is not a finding of fact binding on the federal court to the extent stated by [former] 28 U.S.C. § 2254(d) [now § 2254(e)(1)]." *Id.* at 698. Rather, "although state court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of § 2254[(e)(1)], . . . both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." *Id.* It follows, then, that § 2254(d)(1) applies to the state court's conclusion that the petitioner's trial counsel rendered effective assistance of counsel and this court may not grant relief on this claim as long as the state court denied the claim based on a reasonable application of the *Strickland* standard to the facts presented in the state court proceeding.

"The benchmark for judging any claim of ineffectiveness must be whether *counsel's conduct* so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686 (emphasis supplied).

Habeas relief may be granted only if the state-court decision unreasonably applied the standard for evaluating ineffective-assistance-of-counsel claims established by *Strickland*. *Knowles v. Mirzayance*, 556 U.S. 111, 122–23, (2009). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but

whether that determination was unreasonable—a substantially higher threshold." *Id.* at 123 (internal quotation omitted). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S.Ct. at 788 (internal citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

A showing of prejudice requires that 1) counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable, and 2) there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *See Strickland*, 466 U.S. at 687, 694. "The benchmark [of an ineffective assistance claim] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687; *Harrington*, 131 S.Ct. at 787–88 (citing *Strickland*, 466 U.S. at 687). A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. *Strickland*, 466 U.S. at 697.

A.  Performance Prong

After finding that Fowley erred in eliciting the initial identification of petitioner by Carew and in failing to move to strike or for a mistrial resulted from "unreasonable professional judgment" and that Fowley's representation likely fell below an objective standard of reasonableness rendering his representation deficient (ECF 7-6, p. 36), the post-conviction court

held that "[i]t is not so apparent that Mr. Fowley's following and reactive questions, intended to afford Detective Carew an opportunity to correct and report the non-identification by Jenkins, were not the result of reasonable and professional judgment." ECF 7-6, p. 36.

The court's finding of deficiency was qualified, however, by its finding that Fowley could not have anticipated Carew would answer the questions posed unresponsively and inaccurately. *Id.*, pp. 36-38. The court further found that Fowley appropriately reacted to the unanticipated admission of the identification testimony by establishing during further cross examination that Carew's initial testimony regarding the source of the identification was inaccurate; Thompson/Mason used aliases, was high on drugs or alcohol at the time of the identification, and was provided leniency in her own case in exchange for the identification. *Id.*

The post-conviction court's effort to justify Fowley's questions that led to the identification testimony, the follow up-question regarding the identification, and the absence of a motion for mistrial or to strike are unreasonable. The post-conviction court found that Fowley's failure to raise a motion to strike the improper identification was reasonable because it was based on his "familiarity with the Jenkins observations, the Mason/Thompson statement and his experience, that formal objections and repeated unsuccessful requests to approach Judge Murdock, would have caused the jury to pay undue attention or highlight the Carew testimony on the subject." *Id.*, pp. 36-37. The court further found that Fowley "pursued a trial strategy to attack the Mason/Thompson statement before the jury, and to pursue Defendant's Motion for judgment before the Judge." *Id.*, p. 38. The court further found that these were tactical decisions by counsel. *Id.* The efforts by the post-conviction court to justify Fowley's disastrous handling of the Carew cross-examination were not based on evidence presented to the post-conviction court

as Fowley passed away years before the post-conviction hearing. ECF 7-6.  Fowley's "beliefs" were not available to the post-conviction court either by way of testimony or from review of his trial preparation notes (which were not presented at the hearing).  Nothing in the record suggests what Mr. Fowley "believed,"  nor is there any evidence that his efforts to "impeach" the inadmissible evidence was based on sound trial tactics.  Instead the record suggests that Fowley simply compounded his error due to his failure to appreciate other avenues for attempting to cure the mistake,  *i.e.*  by objecting, moving to strike, or moving for a mistrial or a new trial.

The post-conviction court also found that Fowley "consulted with Petitioner and devised a course of further examination to mitigate the damage and attack the Sixth Amendment Confrontation problem."  ECF 7-6, p.34.  Again, there is no support for this finding in the record. Emerson-Bey testified at the post-conviction hearing that in general he consulted with Fowley during the trial. There was no specific testimony that Fowley and Emerson-Bey consulted about Fowley's error in having the inadmissible identification come before the jury and/or the best way to move forward once the damage was done. There is no evidence that counsel "devised a course" to mitigate the damage. The record reflects that a lunch break was taken during Carew's testimony and that after the break Fowley attempted to clarify Carew's testimony but he made no effort to have the evidence placing Emerson-Bey at the scene stricken. The post-conviction court assumed that Fowley reviewed the inadmissible witness statements before resuming his cross-examination but there is no record evidence that this was done. Simply stated, there is no evidence as to Fowley's thought process in not moving to strike, or seek a mistrial or a new trial.[7] "Tolerance of tactical miscalculations is one thing, fabrication of tactical excuses is quite

---

[7] In fact, at sentencing the court specifically asked Fowley whether he had filed a Motion for New Trial.  ECF 18, Ex. 18, p. 2.  He indicated he filed one that day, and it was denied *sua sponte*, as untimely. *Id*.

another." *Griffin v. Warden*, 970 F. 2d 1355, 1359 (4th Cir. 1992) )("the 'cogent tactical considerations' that the state court bestowed on [counsel]...are exercises in retrospective sophistry") citing *Kimmelman v. Morrison*, 477 U.S. 365, 386-387 (1986) (hindsight cannot be used to supply a reasonable reason for decision of counsel); *U.S. v. Luck*, 611 F. 3d 183, 188 (4th Cir. 2010) (quoting *Griffin*, 970 F. 2d at 1358)([W]ere we to hold that failing to compel the strategy-was a tactical decision by counsel, we would conjure up [a] tactical decision[] an attorney could have made but plainly did not.") In light of the foregoing it is clear that Fowley's conduct of the cross-examination and failure to move to correct same deprived Emerson-Bey of the effective assistance of counsel.

B.    Prejudice Prong

Where the trial attorney's conduct is unreasonable, as is here, petitioner nevertheless must show "a reasonable probability" that the outcome of the proceedings would have been different. *Strickland*  at 694. While inadequate cross-examination is rarely a basis for finding ineffective assistance of counsel, the same is not true where defense counsel unreasonably elicits damaging information to the defense during cross examination. While the post-conviction court found that counsel's representation "likely" fell below an objective standard of reasonableness it nevertheless found, that "the trial transcript reflect[ed] overwhelming evidence against petitioner" beyond the inadmissible hearsay identification. ECF 7-6, pp. 36, 38-39.  This finding, as discussed *supra*, is not supported by the record.

Where the state court identified the correct governing legal principles from the Supreme Court's decisions but unreasonably  applied such principles to the facts of the case before it,  a federal habeas court may grant the writ under the "unreasonable application" clause of 28 U.S.C.

40

§ 2254(d)(1). A decision is "contrary to Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth our cases." *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495 (2000). So long as the standard originally established by the Supreme Court is applied, this court may consider decisions of lower federal courts applying that standard. *See Williams v. Thurmer*, 561 F.3d 740, 745 (7th Cir. 2009) (finding that, under AEDPA, "decisions of courts of appeal . . . are instructive on whether a particular application of federal law is reasonable"); *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) ("[W]hile the principles of clearly established law are to be determined solely by resort to Supreme Court rulings, the decisions of lower federal courts may be instructive in assessing the reasonableness of a state court's resolution of an issue.").

In *Moore v. Johnson,* 194 F.3d 586, 611-612 (5th Cir. 1999), the habeas petitioner maintained that his trial counsel was ineffective by eliciting damaging evidence against him during cross-examination of the state's first witness, who was the arresting officer. The Fifth Circuit court concluded as follows:

> The district court's factual determination that Devine's [defense counsel] cross-examination of the state's first witness effectively destroyed Moore's alibi defense, long before the state offered such probative evidence and long before Moore's confession was deemed admissible, is not clearly erroneous. Moreover, neither the record nor common sense supports the proposition that Devine's approach to Autrey's testimony was motivated by any strategic purpose that could conceivably have yielded any benefit to the defense. (Citations omitted.) To the contrary, Devine's cross-examination of Autrey does nothing but set forth, from the mouth of Moore's own trial counsel, the state's best case against Moore. While perhaps not sufficient standing alone to support conviction, the evidence thus elicited would have contributed significantly to a guilty verdict, even if Moore's confession had been later deemed inadmissible. For the foregoing reasons, we affirm the district court's conclusion that Devine's ineffective cross-examination of Autrey constitutes deficient performance as defined in *Strickland.*

41

In *Davis v. Woodford,* 384 F.3d 628, 664 (9th Cir. 2004), the court determined that inadequate preparation for a witness's testimony may itself constitute deficient performance, even if the decision to call the witness could ultimately be considered reasonable. The *Davis* court concluded, "The complete failure to investigate and prepare for Dr. Vicary's negative testimony was devastating and cannot possibly be considered 'sound trial strategy.'" *Id.* at 664. *See also Wade v. Calderon,* 29 F.3d 1312, 1323 (9th Cir. 1994), overruled on other grounds by *Rohan ex rel. Gates v. Woodford,* 334 F.3d 803, 815 (9th Cir. 2003) (where the introduction by counsel of damaging testimony against a client suggested ineffective assistance of counsel.)[8]

Here the post-conviction court's ruling contains a number of factual errors regarding the evidence produced as to Emerson-Bey's guilt, as noted above.  Additionally, the post-conviction court erred in its determination that there was no prejudice inuring to Emerson-Bey due to his counsel's errors.

The post-conviction court's characterization of the non-identification evidence of petitioner's guilt presented at trial is erroneous.  Contrary to the characterization of the evidence presented as to Emerson-Bey, the evidence was neither abundant nor overwhelming. When

---

[8]*See also*: *State v. Villapando*, 259 F.3d 934 (8th Cir. 2001) (finding ineffective assistance where counsel's cross-examination  had no strategic value and established defendant's character as "threatening and murderous"); *People v. Bailey*, 374 Ill. App. 3d 608 (Ill. App. Ct. 1st Dist. 2007)(finding that counsel was ineffective because counsel elicited  damaging testimony that proved an element of the State's case); *Glancy v. State*, 941 So. 2d 1201 (Fla. Dist. Ct. App. 2d Dist. 2006)(holding that elicitation of damaging  character evidence with no remedial action afterward was ineffective assistance of counsel); *Whitaker v. State*, 276 Ga. App. 226 (Ga. Ct. App. 2005)(finding ineffective assistance where trial counsel used certified copies of convictions to impeach State witnesses and failed to redact implications of defendant's involvement) *State v. Barr*, 158 Ohio App. 3d 86 (Ohio Ct. App., Columbiana County 2004)(finding ineffective assistance of counsel when counsel opened the door to admission of statements to police that had previously been suppressed);  *People v. Morris*, 807 N.E.2d 377 (Ill. 2004), overruled on other grounds sub. nom *People v. Pittman* , 813 N 2d 93 (Sup.Ct.lll.  2004)(finding ineffective assistance where counsel introduced evidence of a prior murder which had the effect of nullifying the trial strategy of a plea for jury sympathy); *Chatmon v. United States*, 801 A.2d 92 (D.C. 2002)(holding  that defense counsel's questioning of a detective eliciting a witness's inadmissible out-of-court identification of defendant was ineffective assistance of counsel); *State v. Dornbusch*, 384 N.W.2d 682 (S.D. 1986)(finding ineffective assistance where counsel broached the subject of a polygraph exam and failed to object when the State elicited the fact that defendant refused the test).

determining whether a petitioner was prejudiced by the conduct of counsel, the court "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. A case, such as this one, where the "verdict or conclusion [is] only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id*., at 696.

While the State's evidence against Emerson-Bey may have supported a guilty verdict in the absence of the improper identification testimony, that is not the proper inquiry under *Strickland*. Rather the question is whether there is a "reasonable probability" of a different outcome had the identification been excluded. *Strickland*, 466 U.S. at 694. Given the importance of the identification in this case, there can be no confidence that there is no "reasonable probability" that the improper identification affected the outcome of the trial.

In *Chatmon v. United States*, 801 A. 2d 92, 102-108 (D.C. 2002)[9] a photo array was excluded pretrial as unduly suggestive, however, defense counsel unexpectedly, as in this case, elicited the detective's testimony regarding the excluded identification. The prosecutor pursued details of the improper identification on redirect and defense counsel failed to object. The trial court moved to address what he characterized as the "bizarre" circumstances created by defense counsel's "blunder" via curative instructions. *Id.,* pp. 102-108. Nevertheless, the reviewing court found petitioner was entitled to habeas relief, holding that counsel provided ineffective assistance of counsel which prejudiced petitioner. The *Chatmon* court found that defense counsel's questioning introducing identification of appellant as the shooter, which had been

---

[9] The post-conviction court sought to distinguish *Chatmon* from the facts of this case finding that Fowley's actions demonstrated mere errors of judgments and tactics versus ineffective assistance of counsel.

excluded by agreement *in limine,* significantly strengthened the government's case constituting ineffective assistance under *Strickland*.

Like the *Chatmon* case, if Thompson/Mason's identification was excluded from the evidence presented to the jury, there is a reasonable probability that the jury would have had a reasonable doubt as to Emerson-Bey's guilt and the outcome of his trial would have been different. As such, he is entitled to habeas relief.

3.      Confrontation Clause Violation

Related to his ineffective-assistance of counsel claim, petitioner raises a stand-alone Confrontation Clause claim regarding the out of court identification of him by Thompson/Mason which was introduced via Detective Carew. Respondents contend that the claim is procedurally defaulted.

A.      Procedural Default

Before petitioner may seek habeas relief in federal court, he must exhaust each claim presented to the federal court by pursuing remedies available in state court. *See Rose v. Lundy*, 455 U. S. 509, 521 (1982). This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S. Ct. 1728 (1999); 28 U.S.C. § 2254(b) and (c). In Maryland, this may be accomplished by raising certain claims on direct appeal and with other claims by way of post-conviction proceedings. Exhaustion is not required if at the time a federal habeas corpus petition is filed petitioner has no available state remedy. *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989).

The doctrine of procedural default is applicable when a petitioner fails to comply with a

state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "independent of the federal question and adequate to support the judgment." *Walker v. Martin*, 562 U.S. 307, 315 (2011) (internal quotations omitted).Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal, or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478, 489-91 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U.S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief).  A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999).

> As the Fourth Circuit has explained:

> If a state court clearly and expressly bases its dismissal of a  habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim.  *See Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).  A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1.

*Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

Respondents contend that petitioner's Confrontation Clause claim is procedurally defaulted. ECF 47, p. 14. The post-conviction court held that "in the absence of a motion to strike by [defense counsel] it is not apparent that any advance or cotemporaneous decision by the trial judge on the issue of the Jenkins/Mason/Thompson statement is an apt subject for post-

conviction relief." ECF 7-6, pp. 46-47, n. 31. Petitioner's Confrontation Clause claim may be considered even though procedurally defaulted where, as here, he establishes cause and prejudice or a fundamental miscarriage of justice.

If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law" or "a fundamental miscarriage of justice." *Lewis v. Wheeler*, 609 F.3d 291, 309 (4th Cir. 2010) (quoting *Vinson v. True*, 436 F.3d 412, 417 (4th Cir. 2006) (internal quotation marks omitted). "Cause" consists of "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in state court at the appropriate time." *Id.* (quoting *Murray*, 477 U.S. at 488). Prejudice requires a showing that errors at trial "worked to [the petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 168, (1982).

Petitioner contends that the ineffective assistance of trial counsel is sufficient to excuse his procedural default. Courts have held that the cause and prejudice to excuse procedural default can be shown via proof of ineffective assistance of counsel under *Strickland*. In this context, the Supreme Court has explained:

> Attorney ignorance or inadvertence is not 'cause'. . . . Attorney error that constitutes ineffective assistance of counsel is cause, however. . . . [I]f the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State. . . . In other words, it is not the gravity of the attorney's error that matters, but that it constitutes a violation of petitioner's right to counsel, so that the error must be seen as an external factor, i.*e.*, imputed to the State.

*Coleman*, 501 U.S. at 753-54, (citations and internal quotation marks omitted); *see also Restrepo v. Kelly*, 178 F. 3d 634, 640-642 (2d Cir. 1999)(habeas review not precluded where

attorney's failure to file appeal constituted cause and ineffective assistance was prejudicial per se). Respondents concede that a finding of ineffective assistance of counsel can be used to show cause to avoid a plain statement of procedural default where the ineffective assistance claim has been litigated in state court. ECF 47, p. 15 (citing *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). They argue that petitioner has not exhausted his ineffective assistance claim. I disagree. Petitioner fully litigated his claim regarding Fowley's unreasonable eliciting if the identification information. Having found that trial counsel rendered constitutionally ineffective assistance and Emerson-Bey was prejudiced, he has shown sufficient cause and prejudice to excuse the default and his separate Confrontation Clause claim may be considered on the merits.

    B.    Harmless Error Analysis

    Fowley's inept handling of the cross-examination of Detective Carew violated Emerson-Bey's right to counsel as well as his right to confrontation. The Confrontation Clause protects defendant's literal right to confront witnesses at time of trial (cases involving admission of out-of-court statements as found here) and his right to cross-examination free from restrictions which effectively neuter that right (cases involving restrictions on the scope of cross-examination). *See Delaware v. Fensterer*, 474 U.S. 15 (1985). The right guaranteed by the Sixth Amendment to confront and cross-examine witnesses is made obligatory on states by the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400 (1965). In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court held that the testimonial statement of a person who is not called as a witness may not be admitted against the accused for its truth unless the declarant is unavailable, and the defendant had a prior opportunity to examine the witness. Here, Emerson-Bey had no opportunity to examine the deceased witness who identified him as fleeing the scene of the

murder. The State could not have presented the evidence, instead, his own lawyer did. It is clear that a Confrontation Clause violation occurred in this case. Thompson/Mason's identification of Emerson-Bey was testimonial and Emerson-Bey had no opportunity to cross-examine her.

Confrontation Clause violations are subject to harmless error analysis. *Lilly v. Virginia*, 529 U.S. 116, 140 (1999). To determine whether an error is harmless on habeas review the court must determine whether the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrhamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakas v. United States*, 328 U.S. 750, 776 (1946).

Harmlessness is evaluated by considering (1) "the importance of the witness'[s] testimony in the prosecution's case," (2) "whether the testimony was cumulative," (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points," (4) "the extent of cross-examination otherwise permitted," and (5) "the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

In this case, the improper identification was important as it was the only direct evidence of Emerson-Bey's involvement in the crime and the only evidence that placed him at the crime scene at the time of the crime. The identification testimony was not cumulative, nor was it corroborated by any other evidence. The evidence was contradicted by Emerson-Bey's testimony and alibi defense. No cross-examination was permitted as the witness did not testify. Fowley's efforts to impeach the inadmissible evidence and rehabilitate the identification during cross-examination was insufficient. His efforts, under taken after a lunch break, served to highlight the testimony and confirm that Emerson-Bey had been seen fleeing the scene-evidence with the State relied on in its closing argument. Lastly, as discussed, above, the overall strength

48

of the prosecution's case was weak with contradictory evidence as to Emerson-Bey's access to the home and relationship with the decedent before the jury.

When considering whether the failure to raise a confrontation clause objection through the lens of *Strickland*, courts must consider the strength of the objection, Here Thompson/Mason was not available for trial, Emerson-Bey had no opportunity to cross examine Thompson/Mason and the statement to police was testimonial. The State conceded that the statement was inadmissible and could not be relied upon until defense counsel opened the door. The post-conviction court also conceded that Carew's testimony "tread[ed] on his rights under the Confrontation Clause," and that when Fowley elicited the statement from Carew, "counsel' representation likely fell below an objective standard of reasonableness." ECF 7-6, p. 36. Given that the prejudice prong under *Strickland* is stricter than the harmless error analysis under *Brecht*, Emerson-Bey has satisfied the requirement that the error was substantial and injurious. *See Kyles v. Whitley,* 514 U.S. 419, 436 1995) (holding *Strickland* prejudice prong is higher standard than *Brecht* harmlessness).

It should have been obvious to Fowley, even though he elicited the offending testimony, that an objection based on *Crawford* would have been meritorious however, he made no such effort to object to the testimony, to move to strike the testimony, or to move for a mistrial. No advantage was gained by the defense through the admission of the testimony and as discussed above the testimony was extremely prejudicial to the defense.

Without the improper testimony identifying Emerson-Bey as fleeing the scene immediately after the shooting the only evidence of Emerson-Bey's guilt was weak evidence of motive (estrangement and financial hardship) and a palm print found within the home where

Emerson-Bey recently lived and testimony established he frequently visited. While, the post-conviction court characterized the evidence against Emerson-Bey as "overwhelming" the Fourth Circuit has explained, "[t]o start with the assumption that the crime was committed and then to show that each piece of circumstantial evidence can be explained in a consistent manner is fundamentally different from examining each piece of evidence and finally concluding beyond a reasonable doubt that the defendant was guilty." *Evans–Smith v. Taylor,* 19 F.3d 899, 910 (4th Cir.1994).

<u>**Conclusion**</u>

This court finds the state court's decision to be an unreasonable one and will grant the petitioner's petition for writ of habeas corups on the *Strickland* and *Crawford* issues.  While recognizing that the writ affords an extraordinary remedy, this court finds that the rquested relief is necessary in light of the state court's refusal to vidnicate petitioner's constitutional rights. As such, petitioner Carl Emerson-Bey's petition for writ of habeas corpus (ECF No. 1) along with his amendment to and memorandum of law in support of, petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF 40, 42) is GRANTED. Accordingly,  petitioner's conviction and sentence are VACATED, and the case is remanded to the Circuit Court of Baltimore City for a new trial.  However, this court's judgment will be STAYED FOR THIRTY (30) DAYS to allow for an appeal or, absent an appeal, a decision by the Circuit Court for Baltimroe City concerning the petitioner's cotinued confinement.

A separate Order follows.


Date:   July 31, 2017                    ___/s/_____
                                         J. Frederick Motz
                                         United States District Judge